NS:KDE
F.#2018R01351

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

DEVON MARTIN,
        also known as "Ty,"

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

T O   B E   F I L E D   U N D E R
S E A L

2 0 - M J - 5 2 8

A F F I D A V I T   A N D
C O M P L A I N T   I N   S U P P O R T
O F   A N   A P P L I C A T I O N   F O R
A N   A R R E S T   W A R R A N T

(21 U.S.C. §§ 841(b)(1)(A)(i), 846; 18
U.S.C. §§ 924(c)(1)(A)(i) and 2)

EASTERN DISTRICT OF NEW YORK, SS:

     JEFFREY VALENZANO, being duly sworn, deposes and states that he is a

Task Force Officer with the Federal Bureau of Investigation, duly appointed according to law

and acting as such.

     In or about and between July 2018 and January 2019, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant DEVON MARTIN, also known as "Ty," together with others, did knowingly and

intentionally conspire to distribute and possess with intent to distribute a controlled

substance, which offense involved a substance containing heroin, a Schedule I controlled

substance, contrary to Title 21, United States Code, Section 841(a)(1).   The amount of

heroin involved in the conspiracy attributable to the defendant as a result of his own conduct,

and the conduct of other conspirators reasonably foreseeable to him, was one kilogram or more of a substance containing heroin.

(Title 21, United States Code, Sections 846 and 841(b)(1)(A)(i))

In or about and between September 2018 and January 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DEVON MARTIN, also known as "Ty," together with others, did knowingly and intentionally use and carry one or more firearms during and in relation to a drug trafficking crime, to wit: the narcotics conspiracy offense charged herein, and did knowingly and intentionally possess such firearms in furtherance of said drug trafficking crime.

(Title 21, United States Code, Sections 924(c)(1)(A)(i) and 2)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Task Force Officer with the Federal Bureau of Investigation ("FBI") and have been for approximately five years.  I am currently assigned to the New York Metro Safe Streets Gang Task Force, where I investigate gangs, narcotics trafficking, firearms trafficking, robbery, kidnapping and other offenses.  These investigations are

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.  The facts in this Complaint come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses.  Unless otherwise indicated, interpretations of coded language and statements of my belief concerning the substance of intercepted conversations set forth in this Affidavit are based on my and other investigating agents' training and experience, information learned during the investigation, and the context of the quoted conversations.  Further, not all relevant intercepted conversations are described herein. Moreover, for the calls excerpted herein, not all relevant portions of the calls have been described.  Finally, the excerpts of the conversations set forth herein are based upon a draft, not final, transcripts and are subject to revision.

conducted both overtly and covertly.   I am also a Detective with the New York City Police Department ("NYPD") and have been so employed for approximately 19 years.   During my tenure with the FBI and NYPD, I have participated in numerous investigations of drug trafficking organizations, during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed cooperating witnesses and victims, (d) reviewed and analyzed numerous recorded conversations of those engaged in organized crime and gang activities and (e) monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors.   Through my training, education and experience, I have become familiar with the manner in which narcotics distribution, robberies, firearms trafficking and other schemes are carried out, and the efforts of persons involved in such activity to avoid detection by law enforcement.

I.      Overview of the Investigation

2.      Since approximately June 2018, the FBI, together with the NYPD, has been investigating various individuals in Brooklyn and Queens for heroin trafficking, firearms possession and other offenses.   As part of this investigation, law enforcement agents have recovered multiple kilograms of heroin, multiple illegal firearms and various drug paraphernalia, which has led to the convictions of numerous individuals.   During the course of the investigation, law enforcement agents have determined that the defendant DEVON MARTIN, also known as "Ty," is a long-time heroin trafficker based on, among other things, information provided by a cooperating witness ("CW-1"[2]), wiretapped recordings and evidence seized pursuant to search warrants.

---

[2]      CW-1 was arrested in January 2019 and charged with heroin distribution.

II.      Information Provided by CW-1

        3.      CW-1 has reported that he trafficked heroin with the defendant

DEVON MARTIN.   Specifically, CW-1 has stated, in sum, substance and in part, that

MARTIN, who CW-1 has known since approximately 2000, is a long-time heroin trafficker.

Prior to CW-1's arrest, CW-1 supplied MARTIN every week with approximately 70 to 80

"packs"[3] of heroin, stamped with the phrase "World Wide" for MARTIN to distribute.

CW-1 has stated that when MARTIN and CW-1 spoke on the telephone, they would often

use numbers in street names as code to refer to the number of packs of heroin MARTIN

wanted to acquire, e.g., "10th Avenue" would refer to 10 packs of heroin.   CW-1 also stated

that he and others routinely used the word "vibe" to refer to narcotics and referred to the

quality of drugs on a one-to-ten scale (with ten being the highest).   CW-1 also reported that

a co-conspirator ("CC-1") stored CW-1's heroin at CC-1's home and that CC-1 would often

provide packaged heroin to CW-1's customers, including MARTIN.

        4.      CW-1 has also reported that the defendant DEVON MARTIN routinely

carried a large, .40-caliber firearm with him when he met with CW-1 to acquire narcotics.

According to CW-1, at some point MARTIN indicated that he was looking to acquire a

---

After his arrest, CW-1 began cooperating with the government and ultimately pleaded guilty
to heroin trafficking and firearms offenses.   CW-1 is cooperating with the government in the
hopes of receiving leniency at sentencing.   CW-1 has prior convictions for possession of a
controlled substance, grand larceny and criminal possession of a loaded firearm.   In
addition, while one of his prior cases was pending, CW-1 jumped bail and was not rearrested
for multiple years.   The information provided by CW-1 has been corroborated by, among
other things, evidence obtained from other witnesses, the execution of search warrants and
other sources of information.

[3]      Based on my training, experience and involvement in the investigation, I know
that a "pack" of heroin typically contains approximately 100 individual glassines of heroin.

smaller firearm that would be easier to carry with him.   According to CW-1, another co-conspirator in the narcotics operation ("CC-2") gave CW-1 two small, .22-caliber firearms, and therefore CW-1 gave one of these guns to MARTIN and the other to CC-1.[4]

III.     Wiretap Recordings

5.     As part of the investigation, between approximately November 2018 and December 2018 – before CW-1 began cooperating with the government – law enforcement agents monitored wire and electronic communications occurring over a cellular telephone used by CW-1 pursuant to a judicially authorized wiretap.   Interception of CW-1's cell phone revealed that CW-1 distributed kilograms of heroin to, among others, the defendant DEVON MARTIN.

6.     For instance, on November 28, 2018, at approximately 12:32 p.m. (session #418), MARTIN (using a cell phone subscribed in MARTIN's name (the "MARTIN Telephone")) called CW-1.   During the conversation, the following exchange took place:

> CW-1:     What's popping on the vibe?
>
> MARTIN:   What's good my dude [UI[5]]?
>
> CW-1:     Alright, [UI]
>
> MARTIN:   I'm on 10th street.
>
> CW-1:     Alright, word.

---

[4]     Records from the Bureau of Alcohol, Tobacco, Firearms and Explosives show that on September 19, 2018, an individual purchased three North American Arms .22-caliber revolvers with unique serial numbers in Augusta, Georgia.   On July 8, 2019, law enforcement agents recovered one of these firearms from CC-1's home.   On January 16, 2019, law enforcement agents recovered another one of these firearms from CC-2's home.

[5]     "UI" is an abbreviation for unintelligible.

7.      A few minutes later, beginning at approximately 12:38 p.m. (session #s 419, 423), CW-1 and the defendant DEVON MARTIN (using the MARTIN Telephone) exchanged the following text messages:

> MARTIN:      God remind me to bring the 2 from the old next time I come
>
> CW-1:        I remind u next time

8.      Based on my training, experience and involvement in the investigation, I believe that in these exchanges, CW-1 and the defendant DEVON MARTIN discussed trafficking heroin.   Specifically, when MARTIN stated that he was on "10th street," I believe this was a coded reference to his desire to acquire 10 "packs" of heroin.   Further, when MARTIN stated he wanted CW-1 to remind him "to bring the 2 from the old next time I come," I believe MARTIN meant that he wanted to return two packs of heroin that CW-1 had previously delivered to MARTIN.

9.      Further, on November 29, 2018, at approximately 12:01 p.m. (session #688), CW-1 called MARTIN (using the MARTIN Telephone).   During the conversation, the following exchange took place, among others:

> MARTIN:      This the kid that was going crazy over the gray. He like, "Yo, um, he was saying it last like two days, three days, [UI] nine, um, they sayin' um, she weak, she ain't coming through like she was." I was like, "Oh word?   Oh okay."   Then he hit me today, I seen him this morning, he was like, "Yo, um, I think it's just because, I'm hearing about that [UI] and all that."   So I'm like "Oh okay."   "That's why things slowed up for me, 'cause of that."   I was like, "Oh word?   Alright."
>
> CW-1:        It happens for a few days.   It'd be around, it'd be around for a few days, then it be gone.

MARTIN:      That shit would be around until next Friday and
             then that's it.

CW-1:        Yeah, exactly.   We even got a new – we got a
             new situation coming right now anyway.

MARTIN:      It's cool.

. . .

CW-1:        But there's definitely a new situation coming
             anyway.   I just, I just.   You know, it was just
             comin' off the gray vibe with that headache, and
             then we got the new [UI]

MARTIN:      Yeah, yeah, it be like that.

. . .

CW-1:        You know, they always got – if, if she ain't on a
             10 vibe, they, they gonna pay anything.

MARTIN:      Yeah.

CW-1:        She could be on a 9 vibe and they still gonna say
             [UI].

MARTIN:      Yeah!   Yeah!   Like they killin' me.

10.     Based on my training, experience and involvement in the investigation,

I believe that in this conversation, CW-1 and the defendant DEVON MARTIN discussed

trafficking heroin.   Specifically, MARTIN reported that one of his customers had

complained about the quality of heroin ("she weak"), and CW-1 reported that after

individuals used those drugs, he was going to have a new supply ("we got a new situation").

CW-1 explained that the "gray vibe," i.e., a prior supply of heroin (which I know can appear

gray in color) was a "headache."   CW-1 and MARTIN then stated that unless heroin was of

perfect quality ("a 10 vibe"), customers would still complain.

11.     The interception of CW-1's cellular telephone revealed further discussions about heroin trafficking with the defendant DEVON MARTIN.   For instance, on December 3, 2018, at approximately 1:29 p.m. (session #1436), CW-1 called MARTIN (using the MARTIN Telephone), and the following exchange took place:

MARTIN:     Hello?

CW-1:       What's poppin' on the vibe?

MARTIN:     What's good my dude?

CW-1:       You there?

MARTIN:     I was just ready to call you.

CW-1:       Oh get outta here.   Yeah alright.

MARTIN:     Umm, yeah, 11th street?

CW-1:       Alright, cool.

12.     Later that day, beginning at approximately 4:49 p.m. (session #s 1446, 1448, 1450), CW-1 and the defendant DEVON MARTIN (using the MARTIN Telephone) exchanged the following text messages:

MARTIN:     New vibe ????

CW-1:       Yes yes

MARTIN:     Ok

13.     Based on my training, experience and involvement in the investigation, I believe that in these communications, MARTIN requested that CW-1 provide him with 11 packs of heroin ("11th street"), and thereafter, MARTIN asked CW-1 if CW-1 had supplied him with a new mixture of heroin ("New vibe ????"), which CW-1 affirmed ("Yes yes").

14.     Similarly, on December 7, 2018, at approximately 6:03 p.m. (session #2207), CW-1 called the defendant DEVON MARTIN (using the MARTIN Telephone). During the conversation, the following exchange took place, among others:

| | |
|---|---|
| CW-1: | I had to go see somebody that, you know, I been duckin' for a minute. |
| MARTIN: | Oh, okay, okay. |
| CW-1: | Because they been hearing about the new situation.   I was trying not to switch the vibe, you know? |
| MARTIN: | Oh, okay, okay. |
| CW-1: | But, he wasn't going for that. |
| MARTIN: | Oh, he knew what time it is. |
| CW-1: | He's like, "Cmon, man."   Oh, man.   Causing headaches. |
| MARTIN: | Yeah, yeah, yeah I know.   Oh damn, you still had – you were still on the old school flip? |
| CW-1: | Hell yeah. |
| MARTIN: | Oh word? |
| CW-1: | Hell yeah.   That's around like a motherfucker. |
| MARTIN: | Damn. |
| CW-1: | I took two hits back to back. |
| MARTIN: | Wow.   [UI] I didn't know you were still-- |
| CW-1: | You know, sometimes you gotta jump over shit. |
| MARTIN: | Yeah, yeah, yeah. |
| CW-1: | It was two times in a row, so.   It kind of put me in a pain, but. |

MARTIN:     Damn – oh it was, it was two times?   [UI] two
            times.

CW-1:       Yeah, the gray shit, and the last one right now
            wasn't really—

MARTIN:     Ohhhh, okay, okay.   I see what you're saying.   I
            see what you're saying.

CW-1:       And the thing is, once they start hearing about the
            new situation, they on some – I'm stuck.

15.     Based on my training, experience and involvement in the investigation,

I believe that in this conversation, CW-1 and the defendant DEVON MARTIN discussed

their heroin trafficking operation, specifically, the quality of heroin CW-1 had been

supplying.   CW-1 said that he had to see a customer he had been avoiding ("duckin' for a

minute") because that person had heard that CW-1 was supplying others with newer, better

quality heroin ("hearing about the new situation") when CW-1 was still providing the

individual with older, lower quality narcotics ("I was trying not to switch the vibe").   CW-1

explained that he had two incidents of poorer quality heroin ("I took two hits back to back"),

including one occasion involving heroin that was gray in appearance ("the gray shit").

16.     Similarly, on December 14, 2018, at approximately 4:23 p.m. (session

#3229), the defendant DEVON MARTIN (using the MARTIN Telephone) called CW-1.

During the conversation, the following exchange took place, among others:

MARTIN:     I gotta get a haircut at 6:30, but I'm trying to, you
            know, pop over to [CC-1's nickname's] first,
            what you think about that?   .

CW-1:       Alright, let me know.

MARTIN:     Alright, alright, so I'm gonna see you right now.
            I'm gonna [UI] see right now.

| | |
|---|---|
| CW-1: | Alright. |
| MARTIN: | I'm not getting my cut until 6:30.   You know, I don't, I don't wanna sit over there to wait, you know, wait for [CC-1's nickname] til 6:30. |
| CW-1: | Nah, nah, I know that. |
| MARTIN: | Aight. |
| CW-1: | Good look, you know. |
| MARTIN: | No, I'm on my way now, um, just taking 9th street. |
| CW-1: | Alright. |
| MARTIN: | Alright? |
| CW-1: | Alright, cool. |
| MARTIN: | Um, yeah, [UI] 9th street.   Aight, I be there in like, maybe 25 minutes, traffic. |
| CW-1: | Alright, cool. |

17.     Minutes later, at approximately 4:27 p.m. (session #3230), CW-1 called

CC-1.  During the conversation, the following exchange took place:

| | |
|---|---|
| CW-1: | You was in the house or? |
| CC-1: | No, I was just about to pick up [another individual] and shoot to the crib. |
| CW-1: | Oh, alright. |
| CC-1: | Yeah.   [UI] |
| CW-1: | Ty was gonna – Ty was gonna come around with you tonight. |
| CC-1: | Oh, alright, alright.   [UI] I'll hit him up.   I'm right here passing the Burger King. |

| CW-1: | Yea he's like 20 minutes away, he says, so. |
| --- | --- |
| CC-1: | Oh alright, alright.   No doubt. |
| CW-1: | He's gonna hang out, he's gonna hang out til 9 o'clock. |
| CC-1: | Oh, cool, alright, no doubt. |

18.     Later on December 14, 2018, at approximately 5:34 p.m. (session #3247), the defendant DEVON MARTIN (using the MARTIN Telephone) called CW-1. During the conversation, the following exchange took place, among others:

| MARTIN: | Yo, what's good my dude? |
| --- | --- |
| CW-1: | What's poppin' [UI]? |
| MARTIN: | I'm right here, I'm at the light on Pitkin and Pennsylvania, I mean, um, Pitkin and, um, the Conduit.   There's just so much fuckin' traffic. |
| CW-1: | Na, I know, I know. |
| MARTIN: | It's fucking crazy, [UI] it's crazy. |
| CW-1: | Nah, I came – I was calling you, I came to the barbershop and shit to see who would I went to, but I just picked anyway, freestyle. |
| . . . | |
| MARTIN: | Oh, okay, okay.   Alright, well, I'm headed to see [CC-1's nickname]. |
| CW-1: | Alright. |

19.     Based on my training, experience and involvement in the investigation, I believe that in these conversations, the defendant DEVON MARTIN, CW-1 and CC-1 arranged for MARTIN to acquire heroin.   Specifically, MARTIN stated he wanted to see CC-1 and would take "9th Street" to get there, which I believe is a coded reference to

MARTIN's desire to acquire nine packs of heroin.   Indeed, after this conversation, CW-1

called CC-1 and told CC-1 that MARTIN ("Ty") was on his way to CC-1's home and was

going to "hang out til 9 o'clock," i.e., MARTIN was going to acquire nine packs of heroin.

Thereafter, MARTIN told CW-1 that he was caught in traffic but would meet with CC-1

soon.

III.    Evidence Seized Pursuant to Search Warrants

        20.    On January 16, 2019, law enforcement agents executed a search

warrant at CC-1's home.   There, law enforcement agents recovered, among other things,

over three kilograms of heroin, over 8,000 glassine envelopes bearing the stamp "World

Wide" and filled with heroin and packaged into "packs," a firearm, a scale and other

narcotics paraphernalia.   Also on January 16, 2019, law enforcement agents recovered from

CC-2's home various narcotics paraphernalia, including a scale, a press used to package

kilogram quantities of narcotics, a vacuum sealer as well as marijuana and the .22-caliber

firearm described above.

IV.    Conclusion and Request for Sealing

        21.    Because the defendant DEVON MARTIN is currently at liberty, it is

respectfully requested that this Court issue an order sealing, until further order of the Court,

all papers submitted in support of this application, including the application and arrest

warrant, as disclosure would give the target of the investigation an opportunity to destroy

evidence, harm or threaten witnesses, change patterns of behavior, notify confederates and

flee from or evade prosecution and therefore have a significant and negative impact on the

continuing investigation and may severely jeopardize its effectiveness.

14

WHEREFORE, your deponent respectfully requests that an arrest warrant be

issued for the defendant DEVON MARTIN, also known as "Ty," so he may be dealt with

according to law.

JEFFREY VALENZANO
Task Force Officer
Federal Bureau of Investigation

Sworn to before me by telephone this
13th  day of July, 2020

THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK